UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


MILTON FRANKLIN                    CIVIL ACTION NO. 06-cv-0151

VERSUS                             JUDGE HICKS

WARDEN LOUISIANA STATE             MAGISTRATE JUDGE HORNSBY
PENITENTIARY


## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Milton Franklin ("Petitioner") of aggravated rape, and

the court imposed a mandatory life sentence. The conviction was affirmed on direct appeal.

State v. Franklin, 803 So.2d 1057, writ denied, 836 So.2d 85 (2003), and a post-conviction

application was pursued through the state courts without success. Petitioner now presents

in his federal habeas petition four issues that he exhausted in the state courts: (1) sufficiency

of the evidence; (2) a motion to suppress statements to police; (3) the trial court did not

inform the jury of the mandatory sentence that Petitioner faced if convicted; and (4)

ineffective assistance of counsel for presenting an unsupported theory of defense. It is

recommended, for the reasons that follow, that the petition be denied.

### Sufficiency of the Evidence

Petitioner was convicted of aggravated rape, which La.R.S. 14:42 then defined, in

pertinent part, as a rape committed upon a person where the intercourse is deemed to be

without lawful consent of the victim because it is committed under any one or more of the

following circumstances: (1) the victim resists the act to the utmost, but her resistance is overcome by force; (2) the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution; and (3) the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

The prosecution argued that conviction was appropriate under all three theories. Tr. 553-54. The jury was instructed that it could convict under one or more of the three listed circumstances. Tr. 204. The verdict form returned by the jury stated that the jury found Petitioner "guilty as charged of aggravated rape" without any indication of which of the theories was applicable. Tr. 208-09.

Evidence showed that the victim was a female certified nursing assistant who provided in-home care to Petitioner's mother, Mrs. Franklin, who was in a wheelchair. The victim had come to the home for about two years to help Mrs. Franklin with bathing, grooming, and eating. Petitioner lived with his mother, and he slept on a couch in the living room.

The victim arrived one morning, and Petitioner let her into the home. The victim testified that she had seen Petitioner hundreds of times, but she did not consider him a friend, and her conversations with him had pertained to his mother and her care. The morning began uneventfully, with the victim taking care of Mrs. Franklin and preparing her breakfast. Mrs. Franklin, seated in her wheelchair in the kitchen, was eating, and the victim was making up Mrs. Franklin's bed. Petitioner came from behind the victim and grabbed her in a

headlock. The victim testified that she felt a knife at her throat. The knife turned out to be a "Case" butter knife.

The victim asked Petitioner what he was going to do, and Petitioner kept telling her to go into the bedroom. The two then started fighting, and Petitioner started choking the victim to the point that she was about to pass out. He told the victim that he would kill her and relented only when she agreed to stop fighting. Petitioner then forced the victim into another bedroom, where Petitioner again choked her and said that he would kill her. Petitioner forced the victim to the side of the bed, face down, and stood behind her. He then ripped open the victim's pants and told her to spread her legs. The victim testified, "and he put his penis in my vagina."

Mrs. Franklin came down the hall in her wheelchair, saw what was happening, and began screaming. Petitioner eventually left the bedroom, but he blocked the front door so that the victim could not leave. She ran out a kitchen door, drove her car to a nearby Texaco station, ran inside, and called 911.

A rape exam at the LSU Medical Center included a vaginal swab that detected a small amount of sperm. DNA testing established a one in 391 trillion chance that the sperm could have been from someone other than Petitioner. Shortly after the rape, Petitioner gave a note to a neighbor, addressed to his mother, that admitted Petitioner had done something wrong and indicated that he was going to hang himself. Petitioner later surrendered to police. He consented to a search of his home, and he showed the police the butter knife and identified

it as the one he used. Several hours later, Petitioner gave a statement to police in which he admitted telling the victim to pull her pants down, admitted that he threatened the victim with the knife as he ordered her to do so, and admitted having sex with the victim, although he denied that it was rape.

Petitioner argues that this evidence was insufficient to prove his guilt because (1) the state did not prove that a dangerous weapon was used during the commission of the events, and (2) the victim and a witness made statements to suggest an attempted rape rather than an actual rape.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court invoked, recited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the State court's decision was an

"unreasonable application" of <u>Jackson</u>. 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1523 (2000); <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. <u>Williams</u>, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. <u>Lockyer v. Andrade</u>, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

The state appellate court addressed at length the contention that the butter knife was not a dangerous weapon, which La.R.S. 14:2(3) defined as "any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." The Court noted the victim's testimony that Petitioner put the knife to her neck, threatened to kill her, and used enough force to cause multiple bruises on the victim's body. The Court also cited a Louisiana decision in which a defendant had stabbed a victim to death using a butter knife, and another case where first degree murder was committed by stabbing a female victim to death with a fork and a butter knife. The Court concluded that

Petitioner's use of the butter knife in the commission of this rape was using the instrumentality in a manner that was likely to have produced death or great bodily harm if the victim had not complied with the demands. State v. Franklin, 803 So.2d at 1062-63.

Petitioner offers no new arguments in his federal petition. He merely repeats conclusory suggestions that a Case butter knife held against someone's throat is not calculated or likely to produce death or great bodily harm. He argues that the victim was not actually cut, but a person need not use a knife to cut or stab someone, just as he need not fire a gun, for the instrumentality to serve as a dangerous weapon within the meaning of criminal law. Petitioner's attack on the dangerous weapon element also does not foreclose a conviction based on the use of force or threats to overcome or prevent resistance. The state court's assessment of this issue was entirely correct and cannot be said to have been an objectively unreasonable application of Jackson.

Petitioner next argues that the evidence is insufficient because the victim made a statement during her 911 call that Petitioner *attempted* to rape her. Petitioner also points to the testimony of Pamela Bryant, who was employed at the Texaco station when the victim arrived. He contends that aspects of the 911 call and Ms. Bryant's testimony support only a lesser conviction of attempted rape.

The 911 call was discussed during direct examination of the victim. After the tape was played, the prosecutor pointed out that the victim "told the 911 operator that he

attempted to rape you." The victim was asked to explain. She testified: "I thought - - I didn't think he ejaculated and I thought that rape meant he had ejaculated." Tr. 471-72.

Ms. Bryant testified that she was working as an assistant manager when a cashier told her that a woman had come in and "said that she had been raped." Ms. Bryant stated that the victim was hysterical and crying and was trying to talk to someone at the police station. After the victim got off the phone, she told Ms. Bryant what had happened. As Ms. Bryant described it, the victim said that Petitioner had a knife and "put it to her or whatever and he was going to rape her." She added, "and the only reason that she had got away or whatever was that the mother had hollered for him to stop and she ran out and that's when she come to Texaco and called the police." Tr. 479-80.

Petitioner raised this argument on direct appeal, Tr. 534, but the state appellate court did not specifically address it. The Court did note that the verdict rested on the jury's choice to believe the victim and not Petitioner's testimony that denied the rape and asserted that he and the victim had engaged in consensual sex on other days. Franklin, 803 So.2d at 1063. The victim plainly explained her reference to attempt during her 911 call, and the Texaco clerk's recitation is hardly such definitive evidence as to require a jury to ignore the direct testimony of the victim that penetration occurred. The state court's denial of relief based on these arguments was not an objectively unreasonable application of the Jackson standard.

**Motion to Suppress Statements**

Petitioner filed a pre-trial motion to suppress statements that he made to police. He argued that the statements were not admissible because of his intoxication and mental state at the time he gave them. There was evidence that Petitioner had been drinking and using crack cocaine around the time of the crime.

A confession must be voluntary to be admissible, and a judge must make a determination of voluntariness before the confession is admitted to the jury. Jackson v. Denno, 84 S.Ct. 1774 (1964). A suspect also has a right to be informed of his right to remain silent when faced with custodial interrogation, but the suspect may waive that privilege if the waiver is made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 86 S.Ct. 1602, 1612 (1966).

Mental status alone will not require suppression because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process of the Fourteenth Amendment." Colorado v. Connelly, 107 S.Ct. 515, 522 (1986). And there is "no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context." Id. at 523. The Constitution and the exclusionary rules are not concerned with moral or psychological pressures to confess. They are aimed at deterring police misconduct or overreaching, not ensuring "free choice" in any broad sense. Id.

The states are free to impose additional requirements before confessions or statements may be admitted in their courts, and the Louisiana courts in this case applied La.R.S. 15:451 that requires a confession to be free and voluntary, and not made under influence of fear, duress, threats, promises or other enumerated influences. This habeas review is not concerned with whether the state court properly applied state law. The only issue is whether the state court's adjudication of the suppression issue was or was not an objectively unreasonable application of the clearly established Supreme Court precedents discussed above. Mere errors of state law do not permit habeas relief. Collier v. Cockrell, 300 F.3d 577, n. 5 (5th Cir.2002).

The trial court held a pre-trial hearing on the motion to suppress. The witnesses were a crime lab representative (regarding the DNA evidence) and the two police detectives who were present when Petitioner gave his statements. Tr. 601-72. During Detective Eatman's testimony, the court listened to a recording of Petitioner's statement. A transcript of the statement is in the record at Tr. 161-77.

Detective Eatman told Petitioner that he was going to read him his rights, and he handed Petitioner a "standard rights card." Petitioner said that he could not read, so Detective Eatman read to him the rights (silence, attorney, etc.) on the card, and he asked Petitioner, "Do you understand that?" Petitioner's response was transcribed as inaudible, and Eatman followed up with, "You do?" Petitioner answered, "Yea." Detective Eatman then asked Petitioner to place his initials on the card to indicate that he understood what was on

that side of the card. There was a pause as Petitioner apparently did initial the card, followed by Detective Eatman asking Petitioner to turn over the card. Eatman then read the language on the second side of the card regarding waiver of the rights just explained and that Petitioner could waive the rights if he wanted and make a statement. Petitioner was asked if he understood those rights, and he again said, "Yea." Petitioner was asked to sign the card to indicate his understanding. After a pause, Detective Eatman asked if Petitioner wanted him to read the card again. Petitioner said that he did, and Eatman again read the waiver language. Petitioner was asked if he understood, and he answered "Yea, these are privilege of my rights." He then added, "In this case, do I want to make a statement ... I signed my name to this." Petitioner signed and dated the card, and the questioning began about the crime.

The trial judge, in a written decision, made factual findings that the detectives knew before Petitioner gave his statement that Petitioner had written a suicide note and had mental/emotional problems. Detective Eatman had said that Petitioner appeared to be in need of psychological help. The detectives also saw indications at the scene of the crime that Petitioner had been drinking beer and smoking crack cocaine. Finally, the court interpreted the exchange between Eatman and Petitioner regarding the waiver side of the rights card to indicate that Petitioner failed to indicate that he understood the waiver of rights. The judge did not distinguish between the waiver of _Miranda_ rights and the voluntariness of a confession. He analyzed the issues as one and, after reviewing Louisiana case law, "reluctantly denied" the motion to suppress. Tr. 131-35.

The final reasoned state court decision on the issue came on direct appeal. Petitioner's brief, like the trial court decision, addressed the <u>Miranda</u> waiver and voluntariness issue as if they were one and the same. Tr. 535-37. The appellate court's decision focused on whether the waiver of <u>Miranda</u> rights was valid. It did not separately discuss whether intoxication or mental state made the post-waiver statements involuntary, but the finding of a voluntary and valid <u>Miranda</u> waiver is usually tantamount to a conclusion that the resulting confession was also voluntary. <u>Missouri v. Siebert</u>, 124 S.Ct. 2601, 2607-08 (2004).

The appellate court reviewed the trial court's factual findings regarding the interview, cited <u>Miranda</u> and jurisprudence regarding waivers, and carefully reviewed the evidence surrounding the interrogation. It concluded that the trial court's ruling was correct. Among the relevant facts were Petitioner's statement that he understood his <u>Miranda</u> rights, his signing of the card, and his engaging in conversation with the detective to make sure he understood the form before he signed it.

The appellate court also reviewed the voluntariness of the confession in light of a charge that detectives offered unspecified "help" that was apparently implied to be for Petitioner's possible mental or emotional problems. Detective Eatman testified that Petitioner had suggested in his suicide letter that he needed help of some kind, which Eatman interpreted to mean psychological help. Eatman testified that he did not make any promises to provide such help. Tr. 633-34, 647.

The transcript shows that Petitioner began making his statement and confessed to penetration of the victim, the use of the knife, and other incriminating facts before any help was mentioned. Detective Eatman asked Petitioner if he caused the bruises on the victim, and Petitioner admitted only pushing the victim and maybe putting some of the bruises on her. It was at this point that help entered the discussion. As Petitioner attempted to downplay the amount of force he used, Eatman said, "Now, Milton, look, if you want some help, you need to go on and tell me the truth about what happened, man." Tr. 171. Petitioner answered "I want some help, man. But I'm telling you all the things I remember. I pushed them both." Tr. 172. The interview continued. At the end, Eatman asked Petitioner if the police had promised anything for the statement. Petitioner answered, "Yea, ya'll said ya'll will give me some help." Eatman said that was correct, but asked, "Did we promise you anything?" Petitioner's answer was inaudible. When then pressed for a yes or no answer, Petitioner said, "No." As the interview concluded, Eatman asked Petitioner if there was anything he would like to add to his statement. Petitioner said, "I need some help, that is what I need." Tr. 176.

Petitioner argued on appeal that he would not have given his statement but for the offers of unspecified help. The appellate court found that the detectives did not promise any specific kind of help prior to beginning the confession. It also noted state court jurisprudence that general remarks by police that they will "help" or "do what they can" to make things easier will not negate the voluntary nature of a confession. Federal law is that the existence of a promise is relevant to voluntariness, but it constitutes only one factor in the totality of

the circumstances analysis and does not, alone, render a confession involuntary. <u>U.S. v. Fernandes</u>, 2008 WL 2704547, *5 (5th Cir. 2008). The state court concluded, based on the transcript of the interview and the officers' testimony, that the confession was free and voluntary, and not induced by the mid-interview promise of help. <u>Franklin</u>, 803 So.2d at 1066-67. That determination is a reasonable one based on the record, and it was not an objectively unreasonable application of the Supreme Court precedents discussed above.

**Notice of Mandatory Life Sentence**

Louisiana law provides that if the sentence for an offense contains a mandatory legislative penalty with no judicial discretion, the trial court must, on request of the defendant, instruct the jury on the penalty and allow the defendant to argue the penalty to the jury. <u>State v. Jackson</u>, 450 So.2d 621, 633 (La. 1984); <u>State v. Gage</u>, 965 So.2d 592, 609 (La. App. 2d Cir. 2007). Petitioner was charged with aggravated rape, which carries a mandatory life sentence. Petitioner's first claim in his post-conviction application was under a heading "The Trial Court Failure to Recognize the Mandatory Sentencing Issue." The body of the application indicates, however, that Petitioner actually argued that defense counsel rendered ineffective assistance when he did not request such an instruction or address the penalty in his arguments. Tr. 719-21.

Any argument that the trial court erred is meritless because such an instruction is required by state law only when requested. Furthermore, there is no suggestion that failure

to give such an instruction would violate federal constitutional law as opposed to Louisiana jurisprudence. The issue is whether counsel rendered ineffective assistance in this regard.

The trial court held that there was no prejudice because there was no reasonable probability that the outcome would have been different had counsel asked for and received the jury instruction. Tr. 730-32. The state appellate court ruled, "although the trial counsel made an error in failing to request that the instructions to the jury include that the penalty for aggravated rape was a mandatory life sentence, there is nothing in this record to show that there was a reasonable probability that without this error the outcome of the trial would have been different." The Court added that it was unlikely the jury would have found Petitioner guilty of a lesser crime "since the testimony showed that the applicant committed this crime in the home of his aged, wheelchair-bound mother who witnessed part of the violent act." Tr. 761. The Supreme Court of Louisiana denied writs without comment. Tr. 812.

The state court applied the correct standard, found in <u>Strickland v. Washington</u>, 104 S.Ct. 2052 (1984). The assessment of the prejudice prong was perhaps debatable, but it was rational and supported by the record. The adjudication of this claim by the state courts was not an objectively unreasonable application of <u>Strickland</u>, so habeas relief is not permitted.

**Unsupported Theory of Defense**

Petitioner argued in his post-conviction application that his counsel was ineffective for presenting a "bogus" defense strategy. Petitioner recounted that he had testified, on the advice of his attorney, and told the jury that the did not have sex with the victim on the date

of the alleged crime, but he admitted to having sex with the victim on prior occasions. Petitioner implicitly argued that this defense, based on his own testimony, was so bogus that counsel was ineffective for permitting him to pursue it. Petitioner's only suggested alternative defense was intoxication. Tr. 721-24.

The trial court judge rejected this claim, noting that voluntary intoxication is not a defense to aggravated rape. That crime is a general intent crime, and voluntary intoxication is a defense only to specific intent crimes. Tr. 731. The jury had received instructions on this issue. Tr. 202-03. The trial court also rejected the claim because it was Petitioner's choice to testify and try to persuade the jury that he had consensual sex with the victim on prior occasions. Tr. 731. The appellate court agreed that "voluntary intoxication is not a defense for aggravated rape so that trial counsel did not err in not presenting the defense." With regard to Petitioner testifying, the court wrote: "Even if the trial counsel erred in allowing the applicant to testify, for the reasons stated above there is not a reasonable probability that the outcome of the trial would have been different." Tr. 761.

Defense counsel did not have the ability, however, to decide whether to "allow" Petitioner to testify. That right belonged to Petitioner, and counsel could not stop him from testifying. Counsel could advise Petitioner on the wisdom of testifying, and perhaps Petitioner is arguing that counsel should have persuaded him not to take the stand and give such unsupported testimony. Petitioner's argument on this issue has varied and shifted throughout the state and federal proceedings. As the district attorney notes in memorandum,

Petitioner has alternatively complained that counsel was ineffective for allowing him to testify, stated that it was his absolute right to testify in his own defense, and even complained in one submission that he was prevented from testifying.

Petitioner was allowed to and did testify fully, but the record does not reveal what advice counsel gave him in that regard. Assuming counsel should have tried to convince Petitioner to abandon his foolish attempt to persuade the jury and did not do so, there is still no showing of prejudice. There is no reasonable probability that the result would have been different if Petitioner had simply rested his case without testifying. The state presented overwhelming evidence in the form of victim testimony, a confession, and DNA evidence that pointed to guilt. Petitioner faults counsel for presenting a bogus defense that came from Petitioner's own mouth, but Petitioner has yet to articulate a lawful, alternative defense that could have been raised. There is no doubt that the state court's adjudication of this issue was not an objectively unreasonable application of Strickland to the facts, so habeas relief is not permitted on this final claim.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 6th day of November, 2008.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE